UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEPONSET LANDING CORPORATION, )<br>)<br>    Plaintiff/Defendant-in-Counterclaim, )<br>v. )<br>)<br>THE NORTHWESTERN MUTUAL LIFE )<br>INSURANCE COMPANY, )<br>)<br>    Defendant/Plaintiff-in-Counterclaim, )<br>v. )<br>)<br>TERENCE CONROY, SR., )<br>)<br>    Additional Defendant-in-Counterclaim. ) | CIVIL ACTION<br>NO. 10-11963-JGD |

**MEMORANDUM OF DECISION AND ORDER
ON PLAINTIFF'S MOTION TO STRIKE**

October 22, 2012

DEIN, U.S.M.J.

## I.  INTRODUCTION

This action arises out of a Real Estate Purchase Agreement ("Purchase Agree-ment") pursuant to which the plaintiff, Neponset Landing Corporation ("Neponset"), sold property containing a residential apartment building (the "Property") to the defendant, The Northwestern Mutual Life Insurance Company ("NML").  Under the terms of the Purchase Agreement, NML was required to comply with certain post-closing obligations.  In particular, NML was obligated to pay Neponset an "Earnout Amount," defined as "[a]n amount equal to fifty percent (50%) of the amount by which the Final Capitalized Value

(net of imputed sales costs of 1%) exceeds the Purchase Price, but in no event shall the amount paid to Seller exceed $7,500,000." It was also required to use good faith efforts to manage the Property in a commercially reasonable manner, consistent with the management of similar apartment properties in the area, so as to maximize the net operating income from the Property, and consequently, the Earnout Amount due to Neponset under the terms of the Purchase Agreement. By its claims in this action, Neponset is seeking damages for NML's alleged failure to comply with its post-closing obligations, including its alleged failure to pay Neponset an Earnout Amount of $1,123,920. NML, in turn, has brought counterclaims against Neponset for various pre-closing payments allegedly due under the Purchase Agreement, and against Terence Conroy, Sr., who allegedly guaranteed Neponset's pre-closing payment obligations.

The matter is presently before the court on NML's motion for summary judgment (Docket No. 46). In connection with its opposition to the summary judgment motion, Neponset has filed "Plaintiff's Motion to Strike Portions of the Affidavit of Robin G. Smith" (Docket No. 58). Ms. Smith is the Director of Asset Managment for one of NML's subsidiaries, and is the person with primary responsibility for managing the Property on behalf of NML. She is also the person who performed the calculation of the Earnout Amount on behalf of NML, and determined that no Earnout was due to be paid to Neponset under the terms of the Purchase Agreement. By its motion to strike, Neponset is seeking an order striking certain paragraphs of Ms. Smith's Affidavit, as well as Exhibit 3 thereto, on the grounds that they contain expert opinion, and that NML failed to disclose

Ms. Smith as an expert in accordance with the applicable scheduling deadlines. In addition, Neponset contends that Exhibit 3 constitutes inadmissible hearsay, and should be stricken on that basis as well. For all the reasons detailed below, Neponset's motion to strike is DENIED.

## II. FACTUAL BACKGROUND

By its motion for summary judgment, NML is seeking to establish that Neponset cannot prevail on any of its claims against it because the plaintiff has not proved that it suffered any damages as a result of NML's alleged failure to comply with its post-closing obligations. Specifically, NML argues that Neponset's damages expert, Webster A. Collins, made a mistake in his calculation of the Earnout Amount that Neponset claims is due to it under the terms of the Purchase Agreement, and that when the calculation is corrected, it results in an Earnout payment of zero. (See S.J. Motion (Docket No. 46)). Therefore, NML contends that even if it were assumed that the defendant failed to use good faith efforts to manage the Property in a commercially reasonable manner, NML is entitled to summary judgment because Neponset has not demonstrated that any Earnout Amount would have been due. (Id.). NML is relying on the testimony contained in the Affidavit of Robin G. Smith (Docket No. 49) to establish the critical facts supporting its motion for summary judgment.

Ms. Smith has been employed by NML or one of its subsidiaries for twenty-seven years, and is currently the Director of Asset Management for Northwestern Mutual Real Estate Investments, LLC, a wholly-owned subsidiary of NML. (Affidavit of Robin G.

Smith ("Smith Aff.") ¶ 1). In her capacity as the Director of Asset Management, Ms. Smith has primary responsibility for managing the apartment building located on the Property. (Id.). She is also the individual who calculated the Earnout Amount on NML's behalf, and concluded that no Earnout was due to Neponset under the terms of the parties' Purchase Agreement. (Id. ¶ 4). In her Affidavit, Ms. Smith describes how she calculated the Earnout Amount. (See id. ¶¶ 5-6 and Ex. 3 thereto). She also explains how, in her opinion, Mr. Collins erred in calculating the Earnout Amount, and why no Earnout Amount would be due under Mr. Collins' analysis if the error in his calculations were corrected. (Id. ¶¶ 8-11).

Specifically, Ms. Smith testifies that she based her calculation of the Earnout Amount on a 2009 operating statement (the "2009 Operating Statement") for the Property that was prepared by The Dolben Company, an independent property management firm that had been selected by Neponset to manage the Property. (Id. ¶ 5). The 2009 Operating Statement, which is attached to Ms. Smith's Affidavit as Exhibit 2, lists in detail the income and expense figures for the Property during each month of 2009. (Id. ¶ 6 and Ex. 2 thereto). Ms. Smith describes how she used those figures to create a spreadsheet (the "2009 Operating Statement Summary Report") showing the bottom-line income and expense figures for the six-month period from June 2009 through November 2009 (the "Earnout Period"), the period which was to be used for calculating the Earnout Amount. (Id. ¶ 6). The 2009 Operating Statement Summary Report is attached to Ms. Smith's Affidavit as Exhibit 3. It shows how Ms. Smith used the relevant income and expense

figures from the 2009 Operating Statement to calculate the annualized Net Operating Income for the Property during the Earnout Period, and to determine the Final Capitalized Value in order to calculate the Earnout Amount. (See id. ¶ 6 and Ex. 3 thereto).

Both the 2009 Operating Statement and the 2009 Operating Statement Summary Report contain an expense item labeled "Contingency Fund." (See id. ¶ 7, Ex. 2 at p. 3 and Ex. 3). As Ms. Smith states in her Affidavit, NML listed the Contingency Fund item as a credit of $83,558 in its calculations because credits of $237,904 for that item exceeded expenses of $196,125 during the Earnout Period, thereby yielding an overall net credit expense of $41,779 for the Earnout Period, and an annualized net credit expense of $83,558. (Id. and Ex. 3 thereto). Therefore, although the Contingency Fund was included as an expense item, it resulted in an increase to the Net Operating Income during the relevant time period. (Id. ¶ 7). Ms. Smith explains that because the Earnout Amount was based on the extent to which the Final Capitalized Value exceeded the Purchase Price, if at all, and a higher Net Operating Income would yield a higher Final Capitalized Value, the treatment of the Contingency Fund item as a credit was favorable to Neponset. (Id.).

Ms. Smith also testifies that she reviewed Mr. Collins' calculations of the Earnout Amount, and determined that he made an error in his calculations. (Id. ¶¶ 8-9). Specifically, Ms. Smith determined that Mr. Collins included the $83,558 annualized net credit from the Contingency Fund to reduce the amount of total maintenance expenses incurred during the relevant time period. (Id. ¶ 8). However, he subsequently performed a "below the line" adjustment to NML's operating expenses by subtracting $196,125 in Contin-

gency Fund expenses based on his assessment that such expenses were unreasonable. (Id.). Ms. Smith opines that Mr. Collins generated the $196,125 figure by taking the sum of the Contingency Fund expenses for the four months of the Earnout Period in which there were expenses in the Contingency Fund, but did not include the two months when the Contingency Fund yielded credits. (Id.). Thus, according to Ms. Smith, Mr. Collins improperly reduced operating expenses twice – first, when he included the net credit from the Contingency Fund item to reduce the expenses in his calculation, and again when he reduced operating expenses by an additional $196,125 without including the months in which there was a credit. (See id.). She contends that "Mr. Collins' error yielded incorrect and artificially low operating expenses for the Earnout period, which, in turn, resulted in an illusory alleged Earnout due." (Id.). She further asserts that if Mr. Collins' analysis were adjusted to correct the error, his own analysis would show that no Earnout Amount would be due. (Id. ¶¶ 10-11).

### III.  DISCUSSION

#### A.  Neponset's Challenge to Ms. Smith's Opinion Testimony

Neponset has moved to strike paragraphs 8 through 11 of Ms. Smith's Affidavit, as well as the 2009 Operating Statement Summary Report attached as Exhibit 3, on the grounds that they contain expert opinion that was never disclosed to Neponset pursuant to Fed. R. Civ. P. 26(a)(2). As described above, Exhibit 3 consists of a spreadsheet summarizing certain of the income and expense figures that are contained in The Dolben Company's 2009 Operating Statement, and showing how Ms. Smith calculated the Final

Capitalized Value of the Property for purposes of determining an Earnout Amount. Paragraphs 8 through 11 contain Ms. Smith's opinions regarding the alleged mistake made by Mr. Collins in his Earnout calculations, and describe her conclusions as to what Mr. Collins' analysis would look like if it were adjusted to correct the alleged error. Neponset argues that NML should have disclosed this testimony by the November 14, 2011 deadline for expert disclosure, and that NML's failure to do so warrants that the testimony be stricken. NML argues that it did not disclose Ms. Smith's testimony because she is not an expert and her opinions do not constitute expert testimony. This court agrees, and finds that Ms. Smith's testimony, including the challenged portions of her Affidavit, is admissible as the opinion testimony of a lay witness.

Rule 701 of the Federal Rules of Evidence governs opinion testimony by lay witnesses. It provides that

> [i]f a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.[1]

Fed. R. Evid. 701 (footnote added).

---

[1] Rule 702 provides that: "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."

This court finds that Ms. Smith's testimony falls within the scope of Rule 701.  As an initial matter, Ms. Smith testified that she has personal knowledge of the income and expense figures for the Property, that she is the person at NML with primary responsibility for managing the Property, and that she was the individual who calculated the Earnout Amount on behalf of NML.  Furthermore, Ms. Smith stated that she personally examined Mr. Collins' calculations and concluded that he had made an error in his calculation of reasonable expenses.  Thus, Ms. Smith's opinions were rationally based on her perception.

Additionally, it is undisputed that Ms. Smith's opinions are helpful to determining a fact in issue.  As described above, NML is relying primarily on Ms. Smith's testimony to establish the facts supporting its summary judgment motion.  Therefore, Ms. Smith's testimony is critical to determining whether Neponset has proved damages.

Finally, this court concludes that Ms. Smith's opinions satisfy subsection (c) of Rule 701 because they are not based on scientific, technical or other specialized knowledge.  Accordingly, her testimony is admissible as lay witness opinion.

"Subsection (c) was added in 2000 to 'eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing.'"  Donlin v. Philips Lighting N. Am. Corp., 581 F.3d 73, 80 (3d Cir. 2009) (quoting Fed. R. Evid. 701 advisory committee's notes for 2000 Amendments).  "As a result, lay testimony must 'result[ ] from a process of reasoning familiar in everyday life,' as opposed to a process 'which can be mastered only by

-8-

specialists in the field.'"  Id. at 81 (quoting Notes to 2000 Amendments).  However, this requirement

> does not mean that an expert is always necessary whenever the testimony is of a specialized or technical nature.  When a lay witness has particularized knowledge by virtue of her experience, she may testify – even if the subject matter is specialized or technical – because the testimony is based upon the layperson's personal knowledge rather than on specialized knowledge within the scope of Rule 702.

Id.  Thus, under Rule 701, lay witness opinions on such matters as damages may be admissible "not because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his or her position in the business."  Fed. R. Evid. 701 Advisory Committee Notes to 2000 Amendments.

    The opinions expressed by Ms. Smith in her Affidavit meet this test.  As described in her Affidavit and as shown on Exhibit 3, Ms. Smith used simple arithmetic to calculate the Net Operating Income for the Property based on income and expense figures from the 2009 Operating Statement.  She then used simple calculations to determine the Final Capitalized Value for purposes of arriving at an Earnout Amount.  Her opinions regarding Mr. Collins' calculations were based on a comparison of NML's figures with the figures used by Mr. Collins in his expert reports.  (See Smith Aff. ¶¶ 8-11 and Ex. 3 thereto).  In short, Ms. Smith's relied on straightforward calculations and comparisons to support her opinions, which did not require the skills of an expert witness.  See United States v. Hamaker, 455 F.3d 1316, 1331 (11th Cir. 2006) (finding that witness' testimony was

admissible under Fed. R. Evid. 701 where witness "simply added and subtracted numbers from a long catalogue of . . . records, and then compared those numbers in a straight-forward fashion").

Even if Ms. Smith's opinions were based on specialized knowledge, she has established that any such knowledge was acquired in her capacity as an employee of NML and not in her capacity as an expert in a particular field. As described above, Ms. Smith was the individual at NML with primary responsibility for managing the Property, and she had personal knowledge of the income and expense figures for the Property. Moreover, it was in her capacity as an employee of NML that Ms. Smith originally performed the Earnout calculations and determined that no Earnout Amount was due. Therefore, her opinions are admissible as lay witness opinion under Fed. R. Evid. 701. See Farina v. Compuware Corp., 256 F. Supp. 2d 1033, 1045 (D. Ariz. 2003) (finding that plaintiff's testimony explaining inconsistencies in defendant's bonus calculations, and her description of how bonuses were calculated for other employees, was admissible as the opinion testimony of a lay person where plaintiff was familiar with the record-keeping and business operations of the defendant and had personal knowledge of the documents on which she relied to make her calculations).

### B. Neponset's Additional Challenge to Exhibit 3

Neponset is also seeking to strike the 2009 Operating Statement Summary Report set forth in Exhibit 3 to Ms. Smith's Affidavit on the grounds that it constitutes hearsay, and does not fall within the business records exception to the hearsay rule. NML argues

that the document is admissible as a summary of NML's voluminous income and expense records, and that it is not being offered for the truth of the matters asserted therein, but is instead being offered to demonstrate Ms. Smith's knowledge of the figures and to explain the basis for her testimony. This court finds that Exhibit 3 is admissible as a summary pursuant to Fed. R. Evid. 1006, and that it does not constitute hearsay.

Rule 1006 of the Federal Rules of Evidence provides that

> [t]he proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court. The proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place. And the court may order the proponent to produce them in court.

Fed. R. Evid. 1006.

The 2009 Operating Statement Summary Report satisfies these requirements. As described above, the document contains a summary of certain data that has been extracted from the far more detailed 2009 Operating Statement, and arranged in a manner that shows how NML treated the Contingency Fund expense item and conducted its Earnout calculations. Moreover, the underlying records have been made available to Neponset, and the plaintiff has not objected to the admissibility of those records. See United States v. Keck, 643 F.3d 789, 797 (10th Cir. 2011) (finding that compilation made by copying data from several spreadsheets into a new document would be admissible as a summary under Fed. R. Evid. 1006 where the spreadsheets were independently admissible); Fed. Deposit Ins. Corp. v. Key Fin. Servs., Inc., Civil Action No. 89-2366-DPW, 1999 WL

34866812, at *10 (D. Mass. Dec. 23, 1999) (unpub. op.) (finding that spreadsheets compiled from mortgage loan histories and used by plaintiff to calculate its purported damages were admissible under Rule 1006 where the underlying documents were made available to the defendant and were admissible under the business records exception to the hearsay rule). Accordingly, NML has shown that Exhibit 3 is admissible pursuant to Rule 1006, and that it is not hearsay. See Alliant Tax Credit Fund 31-A, Ltd. v. Murphy, No. 10-5454, 2012 WL 3519463, *10 (6th Cir. Aug. 15, 2012) (slip op.) (finding that district court did not abuse its discretion in admitting spreadsheet showing plaintiff's damages calculations as a summary under Rule 1006, and ruling that "[a] properly admitted summary is not hearsay").

This court also finds that Exhibit 3 is admissible in any event because NML is using it to show what Ms. Smith relied on to make her calculations and render her opinions, and not to prove that the accuracy of the figures contained therein. See Ferguson v. United States, 484 F.3d 1068, 1074 (8th Cir. 2007) (finding no error in district court's admission of spreadsheet on which the IRS relied to calculate excise tax where spreadsheet was admitted as evidence of what IRS had relied on in making its assessment and not to prove that the figures contained in the spreadsheets were accurate calculations of what the excise tax should be). Therefore, the plaintiff's motion to strike Exhibit 3 as hearsay is denied.

### IV.  CONCLUSION

For all the reasons set forth above, the "Plaintiff's Motion to Strike Portions of the Affidavit of Robin G. Smith" (Docket No. 58) is DENIED.

                                             / s / Judith Gail Dein
                                             Judith Gail Dein
                                             U.S. Magistrate Judge