UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| NEPONSET LANDING CORPORATION, | ) | |
| | ) | |
| Plaintiff/Defendant-in-Counterclaim, | ) | |
| v. | ) | |
| | ) | |
| THE NORTHWESTERN MUTUAL LIFE | ) | CIVIL ACTION |
| INSURANCE COMPANY, | ) | NO. 10-11963-JGD |
| | ) | |
| Defendant/Plaintiff-in-Counterclaim, | ) | |
| v. | ) | |
| | ) | |
| TERENCE CONROY, SR., | ) | |
| | ) | |
| Additional Defendant-in-Counterclaim. | ) | |

**MEMORANDUM OF DECISION AND ORDER
ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

October 22, 2012

DEIN, U.S.M.J.

## I.  INTRODUCTION

This action arises out of a Real Estate Purchase Agreement ("Purchase Agreement") pursuant to which the plaintiff, Neponset Landing Corporation ("Neponset"), sold property containing a residential apartment building (the "Property") to the defendant, The Northwestern Mutual Life Insurance Company ("NML").  Under the terms of the Purchase Agreement, NML was required to comply with certain post-closing obligations.  In particular, NML was obligated to pay Neponset an "Earnout Amount," defined as "[a]n amount equal to fifty percent (50%) of the amount by which the Final Capitalized Value

(net of imputed sales costs of 1%) exceeds the Purchase Price, but in no event shall the amount paid to Seller exceed $7,500,000."  It was also required to use good faith efforts to manage the Property in a commercially reasonable manner, consistent with the management of similar apartment properties in the area, so as to maximize the net operating income from the Property, and consequently, the Final Capitalized Value of the Property and the Earnout Amount that would be due to Neponset.  By its claims in this action, including its claims for breach of contract (Count I), breach of the implied covenant of good faith and fair dealing (Count II) and violation of Mass. Gen. Laws ch. 93A ("Chapter 93A") (Count III), Neponset is seeking damages for NML's alleged failure to comply with its post-closing obligations, including its alleged failure to pay Neponset an Earnout Amount of $1,123,920.  NML, in turn, has brought counterclaims against Neponset for various pre-closing payments allegedly due under the Purchase Agreement, and against Terence Conroy, Sr., the alleged guarantor of Neponset's pre-closing payment obligations.

The matter is presently before the court on the "Defendant's Motion for Summary Judgment on Plaintiff's Complaint" (Docket No. 46).  By its motion, NML asserts that Neponset cannot prevail on any of its claims because it has not proved that it suffered damages as a result of NML's alleged failure to comply with its post-closing obligations. In support of its claim for damages, Neponset relies exclusively on its expert, Webster A. Collins.  In its motion for summary judgment, NML argues that Collins made a mistake in his calculation of the Earnout Amount that Neponset claims is due to it under the terms of the Purchase Agreement, and that when the error is corrected it results in an Earnout

payment of zero.  Therefore, NML contends that even if it were assumed that it failed to use good faith efforts to manage the Property in a commercially reasonable manner, it is entitled to summary judgment on each of Neponset's claims because the plaintiff has not demonstrated that any Earnout Amount would have been due.

For all the reasons detailed below, the defendant's motion for summary judgment is ALLOWED IN PART and DENIED IN PART.  NML has established that Collins' calculations are in error and that, when corrected, Collins has not established any actual damages.  Nevertheless, while under Massachusetts law a claim under Chapter 93A cannot survive in the absence of such damages, the inability to establish damages is not dispositive of a plaintiff's contract claims. Accordingly, NML's motion is ALLOWED with respect to the Chapter 93A claim set forth in Count III, but DENIED with respect to the contract claims set forth in Counts I and II.

## II.  **STATEMENT OF FACTS**[1]

### **Scope of the Record**

In its opposition to NML's motion, Neponset argues that summary judgment must be denied because the defendant's Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment ("Statement") fails to meet the requirements of Local Rule 56.1.  That Rule provides in relevant part that

> [m]otions for summary judgment shall include a concise statement of the material facts of record as to which the moving party contends there is no genuine issue to be tried, with page references to affidavits, depositions and other documentation.  Failure to include such a statement constitutes grounds for denial of the motion.

L.R. 56.1.  Neponset contends that NML's Statement is inadequate because it consists principally of argument of counsel and because many of NML's assertions are not supported by appropriate citations to the record.  (Pl. Opp. Mem. (Docket No. 62) at 7-9).  NML disagrees, and contends that it is Neponset's Response to Defendant's Statement of Undisputed Material Facts that fails to comply with Local Rule 56.1 because it "is replete

---

[1]  The facts are derived from: (1) the Defendant's Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment on Plaintiff's Complaint (Docket No. 48) ("DF"); (2) the Affidavit of Robin G. Smith in Support of Defendant's Motion for Summary Judgment on Plaintiff's Complaint (Docket No. 49) ("Smith Aff."); (3) the Affidavit of John P. Connelly in Support of Defendant's Motion for Summary Judgment on Plaintiff's Complaint (Docket No. 50) ("Connelly Aff.") and the exhibits attached thereto ("Def. Ex. __"); (4) the Plaintiff's Response to Defendant's Statement of Undisputed Material Facts (Docket No. 63) ("PR"); (5) the Affidavit of Webster A. Collins (Docket No. 64) ("Collins Aff."); (6) the exhibits attached to the Affidavit of Thomas S. Fitzpatrick (Docket No. 65) ("Pl. Ex. __"); and (7) the exhibits attached to Neponset's Complaint (Docket No. 1-3).  Pursuant to this court's Memorandum of Decision and Order on Plaintiff's Motion to Strike issued on this date, this court denied the plaintiff's motion to strike portions of the Affidavit of Robin G. Smith.  Therefore, this court has considered that Affidavit in its entirety.

with inappropriate legal citations and . . . explicit/unabashed legal argument." (Def. Reply Mem. (Docket No. 66) at 9-11).

This court finds that NML's Statement is sufficient to satisfy Local Rule 56.1. NML has supported most of its factual assertions with citations to the record, including specific references to page numbers, exhibits and paragraphs. Moreover, it appears that most of the facts which Neponset is challenging as argumentative merely reflect the opinions set forth in the Affidavit of Robin G. Smith. As this court has ruled in its Memorandum of Decision and Order on Plaintiff's Motion to Strike issued separately on this date, those opinions are admissible as lay witness opinion under Fed. R. Evid. 701. Therefore, NML's Statement is not improper and does not contain the types of deficiencies that would warrant the denial of NML's motion. Compare Dale v. H.B. Smith Co., Inc., 910 F. Supp. 14, 20 (D. Mass. 1995) (denying motion for summary judgment where defendant failed to file a Local Rule 56.1 statement, presented arguments rather than facts in "Background" section of memorandum, and failed to support factual assertions with citations to page numbers or references to sworn affidavits and depositions); In re Atl. Fin. Mgmt., Inc. Sec. Litig., 718 F. Supp. 1003, 1007 (D. Mass. 1988) (denying summary judgment where facts were not supported by record references and where "many of defendants' assertions [were] not facts, but conclusions, representing inferences defendants hope[d] the finders of fact [would] draw").

To the extent NML's Statement does include statements that are not supported by citations to the record or merely reflect the arguments of counsel, this court has not

credited them as facts.  Similarly, this court has not accepted as facts any responses in

which Neponset has failed to cite to any competent evidence in the record or has simply

taken the opportunity to expand upon its legal arguments.  The Statement of Facts set forth

herein represents this court's careful scrutiny of the parties' factual statements, as well as

the underlying record, and this court's effort to provide a fair description of the relevant

material facts that are, and are not, genuinely in dispute.

## The Purchase Agreement

On April 18, 2006, the parties entered into a Real Estate Purchase Agreement

("Purchase Agreement") for the purchase and sale of a 280-unit apartment building located

in Quincy, Massachusetts (the "Property").  (DF ¶¶ 1-2).   Pursuant to the Purchase

Agreement, NML agreed to purchase the Property, once completed, for $75,584,764.  (DF

¶ 2; PR ¶ 2).  It also agreed to comply with certain post-closing obligations.  (See Purchase

Agreement at Art. 11).[2]  In particular, NML agreed to "pay [Neponset] the Earnout

Amount, if any, on the Payout Date."  (DF ¶ 2; PR ¶ 2).  It also agreed to "use good faith

efforts to manage or cause the Property to be managed in a commercially reasonable

manner intended to maximize Net Operating Income from the Property consistent with

similar apartment properties in the area."  (DF ¶ 5; Purchase Agreement at Art. 11).  By its

claims in this action, Neponset alleges that NML failed to comply with these obligations,

---

[2]  The Purchase Agreement is attached as Exhibit 1 to the Complaint.  (Docket No. 1-3).

and that as a result, Neponset did not receive the Earnout Amount that it would have collected in the absence of NML's breach.

The Purchase Agreement defines the term "Earnout Amount" as "[a]n amount equal to fifty percent (50%) of the amount by which the Final Capitalized Value (net of imputed sales costs of 1%) exceeds the Purchase Price, but in no event shall the amount paid to [Neponset] exceed $7,500,000."  (DF ¶ 3).  Additionally, the term "Final Capitalized Value" is defined to mean the "amount determined by capitalizing Net Operating Income . . . at 6.5%[,]" while the term "Net Operating Income" ("NOI") is defined as "[t]he annualized net income from the Property derived from apartment and parking space rentals determined in accordance with generally accepted accounting principles, consistently applied, for the six months immediately preceding the Earnout Date . . . ."  (DF ¶ 4). There is no dispute that for purposes of calculating the Earnout Amount, Neponset selected the six-month period of June 2009 through November 2009 (the "Earnout Period").  (DF ¶ 2; PR ¶ 2).

### NML's Earnout Calculation

On about January 13, 2010, NML calculated the Earnout Amount in accordance with the relevant provisions of the Purchase Agreement, and determined that the Final Capitalized Value of the Property was $38,442,250.77, over $37 million below the purchase price of the Property.  (See DF ¶ 6; Smith Aff. ¶ 4 and Ex. 1 thereto).  NML provided its calculation to Neponset, and informed the plaintiff that under the formula set forth in the Purchase Agreement, no Earnout Amount was due.  (Smith Aff., Ex. 1).

NML's Earnout calculation was performed by Robin G. Smith ("Smith"), the Director of Asset Management for one of NML's wholly-owned subsidiaries and the primary person at NML involved in the management of the Property.  (Smith Aff. ¶¶ 1, 4). According to Smith, she based her calculation of the Earnout Amount on a 2009 operating statement (the "2009 Operating Statement") for the Property that was prepared by The Dolben Company, an independent property management firm that had originally been hired by Neponset to manage the Property.  (Id. ¶ 5; DF ¶ 7; PF ¶ 7).  The 2009 Operating Statement lists in detail the income and expense figures for the Property during each month of 2009.  (Smith Aff., Ex. 2).  During the course of the litigation, Smith used those figures to prepare a spreadsheet (the "2009 Operating Statement Summary Report") summarizing bottom-line income and expense figures for each month of the six-month Earnout Period.  (See Smith Aff. ¶ 6 and Ex. 3 thereto; Def. Ex. 2).  The 2009 Operating Statement Summary Report illustrates how Smith used those figures to calculate the annualized NOI for the Property during the Earnout Period, and how she applied the 6.5% capitalization rate prescribed by the Purchase Agreement to determine the Final Capitalized Value for purposes of calculating an Earnout Amount.  (See Smith Aff., Ex. 3).  The Report shows that Smith calculated an NOI of $1,463,921 for the six-month Earnout Period, which resulted in an annualized NOI of $2,927,842.  (Smith Aff. ¶ 6 and Ex. 3 thereto).  Smith used the latter figure to calculate the Earnout and to determine that no Earnout Amount was due to Neponset.  (See Smith Aff. ¶¶ 4, 6 and Ex. 1 thereto).

Both The Dolben Company's 2009 Operating Statement and Smith's 2009 Operating Statement Summary Report contain an expense item entitled "Contingency Fund (Extraordinary [Maintenance] & [Repair])."  (Smith Aff., Exs. 2 and 3).  In accounting for this Fund during the Earnout Period, Smith listed the Contingency Fund item as a credit of $83,558 on the 2009 Operating Statement Summary Report.  (Id., Ex. 3).  This was because, as shown below, credits of $237,904 for June ($142,675) and November ($95,229) 2009 exceeded the total expenses of $196,125 for July, August, September and October 2009, thereby yielding an overall net credit of $41,779 for the Earnout Period, and an annualized net credit of $83,558.  (Smith Aff. ¶ 7 and Exs. 2 and 3 thereto).  NML's claim that Neponset has not established damages in this case is based upon the manner in which Neponset's expert treated the Contingency Fund expense item in his calculations supporting Neponset's damages claim.

Smith's treatment of the Contingency Fund item as a credit resulted in a reduction to the Property's annualized maintenance expenses from $458,322 to $374,764, as illustrated in the following segment from Smith's 2009 Operating Statement Summary Report:

| | June | July | Aug. | Sept. | Oct. | Nov. | 6 Month Total | June-Nov. Annualized |
|---|---|---|---|---|---|---|---|---|
| Maintenance Sub-Total | 28,695 | 40,792 | 33,535 | 39,937 | 44,207 | 41,995 | 229,161 | 458,322 |
| Contingency Fund* | (142,675) | 78,659 | 54,879 | 44,750 | 17,837 | (95,229) | (41,779) | (83,558) (2) |
| Total Maintenance | (113,980) | 119,451 | 88,414 | 84,687 | 62,044 | (53,234) | 187,382 | 374,764 |

\* Extraordinary M&R

(Smith Aff., Ex. 3).  The reduction in expenses also had the effect of increasing the NOI by $83,558.  (Id. ¶ 7).  Because the Earnout Amount was based on the extent to which the Final Capitalized Value of the Property exceeded the Purchase Price (if at all), and a higher NOI would yield a higher Final Capitalized Value, NML's treatment of the Contingency Fund item as a credit was favorable to Neponset.  (Id.).  Nevertheless, Smith's calculation of the Final Capitalized Value fell well below the Purchase Price and yielded an Earnout Amount of zero.

### Neponset's Earnout Calculations

Following NML's notification to Neponset that no Earnout Amount was due, the plaintiff retained Webster A. Collins ("Collins"), an appraiser with the firm CB Richard Ellis ("CBRE"), to determine whether NML and The Dolben Company had managed the Property in a commercially reasonable manner, and to calculate the Earnout Amount, if any, that would have been due to Neponset if the Property had been managed appropriately.  (DF ¶ 9; PR ¶ 9).  On July 23, 2010, Collins issued a Real Estate Appraisal

-10-

Consulting Report ("Appraisal Report") in which he concluded that NML and The Dolben Company had failed to manage the Property in a commercially reasonable manner.  (Id.; see also Appraisal Report at 3).[3]  He further concluded that if the Property had been managed in a commercially reasonable manner, the Final Capitalized Value of the Property would have been $77,832,081, and Neponset would have been entitled to an Earnout Amount of $1,123,920.  (DF ¶ 9; PR ¶ 9).  Neponset relies exclusively on Collins' opinion to support its claim of damages in response to the motion for summary judgment.[4]

As described above, the parties' dispute in this action centers around Collins' treatment of the Contingency Fund expense item.  For purposes of its motion for summary judgment, NML accepted Neponset's income calculations as true.  At issue is Collins' opinions concerning his calculation of expenses, and specifically whether in his Appraisal Report he incorporated the $83,558 net credit from the Contingency Fund expense item into his annualized maintenance expense figure.

In support of his opinion regarding the Earnout Amount, Collins determined that annualized operating expenses of $943,175 would constitute commercially reasonable

---

[3]  Collins' Appraisal Report is attached as Exhibit 3(B) to Neponset's Complaint and as Addendum A to Collins' expert report.  (Def. Ex. 3, Addendum A).

[4]  As described below, while Collins did provide a "hypothetical" calculation based on an opinion provided by NML's expert, Alan D. Foster, he emphasized that he was not adopting that calculation, and was maintaining the opinions expressed in his Appraisal Report.

operating expenses for the Property.  (Appraisal Report at 15).   Collins described the

process by which he arrived at this figure in his Appraisal Report as follows:

> Based on study of NML's suggested expense statement, we adjusted
> for extraneous items that are not "commercially reasonable".  Six
> months of expenses for June to November 2009 have been analyzed.
> The contingency category is not "commercially reasonable" and has
> been deducted.  Only "conceptually applied" expenses are included.

(Id.).  The process resulted in the following operating expense statement, which Collins

found to be commercially reasonable under the parties' Purchase Agreement:

### NEPONSET LANDING
### OPERATING EXPENSE ANALYSIS

| CATEGORY | EXPENSE ANNUALIZED |
|---|---|
| **NML expense** | |
| Renting expense | $203,439 |
| Administrative (less management (fee of $191,329)) | 218,848 |
| Utility expense | 391,848 |
| Maintenance expense | 374,763 |
| Turnover expense | 89,482 |
| Other expenses (less insurance allowance of $70,000) | 91,727 |
| Total | $1,370,107 |
| | |
| **CBRE Adjustments for non-includable items** | |
| Advertising | $40,394 |
| Legal | 28,010 |
| Miscellaneous administration | 20,148 |
| Miscellaneous maintenance | 55,612 |
| Office salaries | 64,536 |
| Maintenance equipment | 2,812 |
| Ground rent | 19,295 |
| Contingency | 196,125 |
| Total Adjustments | $426,932 |

**CBRE conclusion of "Commercially reasonable"**
   **operating expenses**                        $943,175
   **$/unit**                                     $3,368

   Source:  Compiled from NML Data

(Id. at 15).

   Accordingly, Collins calculated commercially reasonable operating expenses for

the Property by adding up certain "NML expense[s]" to arrive at a total expense figure of

$1,370,107.  (Id.).  He then performed a "below-the-line" reduction in those expenses by

subtracting items which in his opinion were not commercially reasonable and therefore

"non-includable" in his expense calculation.  (Id.).[5]  This yielded commercially reasonable

annualized expenses of $943,175.  (Id.).  Collins then used that figure to calculate the

NOI, and ultimately an Earnout Amount of $1,123,920.  (See id. at 16).

   As shown above, one of the adjustments that Collins made in his below-the-line

calculation involved a $196,125 reduction in "Contingency" expenses.  It is undisputed

that Collins generated the $196,125 figure by taking the sum of the Contingency Fund

expense item for July, August, September and October 2009, the four months of the

Earnout Period when the Contingency Fund yielded expenses rather than credits, and that

he did not include the two months when the Contingency Fund resulted in credits of

$237,904 because he "did not know what those [credits] were for."  (DF ¶ 13; PR ¶ 13;

_____

   [5]  The parties refer to Collins' figures prior to his adjustments as "above-the-line"
calculations, and his adjustments as "below-the-line" figures.

Def. Ex. 4 at 190).  However, the parties' dispute whether Collins had already used the Contingency Fund item to reduce expenses in his above-the-line calculation, and whether, as a result, his below-the-line adjustment erroneously reduced expenses by again deducting the Contingency Fund, which resulted in artificially low operating expenses for the Earnout Period.

NML contends that the $374,763 maintenance expense figure which Collins used in his above-the-line calculation corresponds to the $374,764 annualized total maintenance expense shown on Smith's 2009 Operating Statement Summary Report.  (DF ¶¶ 10-11).  Since Smith's total maintenance expense of $374,764 incorporated the net credit from the Contingency Fund, NML contends that by using that figure Collins necessarily reduced expenses by the amount of the Contingency Fund ($83,556) in his "above-the-line calculation."  (Id. ¶ 12).  Nevertheless, according to NML, Collins further improperly reduced expenses by subtracting the Contingency Fund again below the line, and compounded the error by deducting $196,125, the Contingency Fund expenses for July-October, without including the months when the Contingency Fund yielded credits of $237,904.  Therefore, NML argues, Collins improperly used the Contingency Fund item to reduce maintenance expenses twice – first, when he included the Contingency Fund net credit to reduce maintenance expenses to $374,763, and again when he reduced operating expenses by an additional $196,125 without including the months in which there was a credit.  (Id. ¶ 14).  The result, according to NML, is that Collins artificially inflated the

NOI by $279,681, which in turn resulted in the erroneous conclusion that an Earnout Amount was due.  (Id. ¶ 15).

Neponset disputes NML's assertion that Collins erred in his calculations, and contends that the defendant's interpretation as to how Collins determined the $374,763 maintenance expense figure is speculative and entirely inaccurate.  (PR ¶¶ 10-11).  Unfortunately, Neponset has declined to explain how Collins' expense figure was actually derived.  Rather, Neponset asserts only that Collins did not have a copy of the 2009 Operating Statement Summary Report at the time he did his analysis.  (See id. ¶¶ 8, 10-12, 14).  However, as discussed in detail below, this court finds that the evidence contained in the record, including evidence from Collins' own Appraisal Report, supports NML's position that Collins adopted the same maintenance expense figure that was used by NML in its own calculations, and which incorporated the $83,556 credit derived from the Contingency Fund item.  This court also finds that Neponset has failed to present any specific facts to contradict that evidence, and that its arguments, including those relating to the 2009 Operating Statement Summary Report, fail to create a disputed issue of material fact.  Collins' denial that he calculated maintenance expenses in the manner described by the defendant is, without more, insufficient to establish an issue of fact.

## Events During the Litigation

In November 2010, Neponset filed this action claiming that NML failed to manage the Property in a commercially reasonable manner and failed to pay Neponset the Earnout Amount due under the parties' Purchase Agreement.  (Docket No. 1).  As part of its

complaint, Neponset attached a copy of Collins' Appraisal Report showing how Collins had performed his calculations and reached his conclusion that NML would have owed Neponset an Earnout payment of $1,123,920 if the defendant had managed the Property in a commercially reasonable manner consistent with similar apartment properties in the area.  (See Compl., Ex. 3B).

On May 6, 2011, during the course of the parties' discovery, NML's counsel sent a letter to Neponset in which he described how NML had used the credit from the Contingency Fund expense item to increase the NOI of the Property during the Earnout Period.  (Def. Ex. 2 at 1).  NML's counsel also attached a copy of the 2009 Operating Statement Summary Report to his letter in order to clarify how the defendant had conducted its Earnout calculation and how it had treated the Contingency Fund item in its analysis.  (See id. at 1, 12).   According to NML, Neponset never responded to that letter. (Connelly Aff. ¶ 5).

Subsequently, on November 14, 2011, Neponset produced Collins' expert report pursuant to Fed. R. Civ. P. 26.  (Def. Ex. 3).  As part of his expert report, Collins specifically incorporated the Appraisal Report containing his opinions as to what the operating results would have been if NML had managed the Property in a commercially reasonable manner.  (See Def. Ex. 3 at 42 and Addendum A thereto).  Therefore, Collins' operating expense analysis is included as part of the plaintiff's expert report.

NML conducted Collins' deposition on December 20, 2011.  (Pl. Ex. A).  During the deposition, Collins was asked the following questions and gave the following responses concerning his below-the-line adjustment for Contingency Fund expenses:

> Q:   Now, with respect to that net operating income opinion value of yours, that would be changed if – that number would be changed if the 196,125 for contingency was – if that deduction was not made, correct?
>
> A:   No.  It shouldn't be included at all.
>
> Q:   I know.  And therefore you took it out, correct?
>
> A.   It's not followed in the chart of accounts.  You don't see contingency ...
>
> Q:   That's not my question.  My question is, your valuation or your arrival at the $5,110,128 for operating income includes making an adjustment of $196,125 for an amount that you call contingency, correct?
>
> A:   Right.  It does not include the NML listed contingency.

(Pl. Ex. A at 212-13 (objection omitted)).

NML contends that this testimony amounted to an admission that the $196,125 adjustment should not have been included in Collins' NOI calculation, an interpretation which Neponset denies.  (See DF ¶ 18; PR ¶ 18).  This court concludes that, when viewed in the light most favorable to Neponset, Collins' testimony cannot be seen as a direct admission by the witness that he erred in his calculations.  Nevertheless, it does indicate that he was attempting to eliminate the Contingency Fund expense item completely from his operating expense calculations.

The parties also dispute whether Collins acknowledged any error in his analysis when he gave the following responses to hypothetical questions:

> Q:     ... Hypothetically, if we took out the 196,125 deduction, it would affect what you have as your net operating income, correct?
>
> A:     Hypothetically it would affect the net operating income.
>
> Q:     All I'm asking you is hypothetically; I'm not asking you in any other way.  And so hypothetically if we were to do that and to eliminate that adjustment of $196,125, do you agree with me that, hypothetically, if that were to occur and then the same cap rate and same sales expense amounts were to be – or categories were used, that that would arrive at an amount below the purchase price?
>
> A:     Hypothetically, that is an accurate statement.

(DF ¶ 19; PR ¶ 19).  Again, this court does not find that Collins' testimony reveals an admission of error.  Nevertheless, it does confirm, as NML argues, that if Collins' analysis were adjusted so that the $196,125 reduction in expenses from the Contingency Fund were eliminated, but the $374,763 maintenance expense figure remained in the above-the-line calculation, it would result in a Final Capitalized Value below the Purchase Price of the Property.  (See Smith Aff. ¶ 11).  Therefore, even assuming all of Collins' other figures remained the same, and Neponset were given the benefit of the net credit from the Contingency Fund in the above-the-line calculation, the elimination of the below-the-line adjustment from the Contingency Fund would result in an Earnout Amount of zero.  (Id.).

Additional factual details relevant to this court's analysis are described below where appropriate.

# III.  ANALYSIS

## A.    Summary Judgment Standard of Review

Summary judgment is appropriate when the moving party shows, based on the discovery and disclosure materials on file, and any affidavits, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "[A]n issue is 'genuine' if it 'may reasonably be resolved in favor of either party.'"  Vineberg v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008) (quoting Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990)).  "A fact is material only if it possesses the capacity to sway the outcome of the litigation under the applicable law."  Id. (quotations, punctuation and citations omitted).

The moving party bears the initial burden of establishing that there is no genuine issue of material fact.  See Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 5 (1st Cir. 2010).  If that burden is met, the opposing party can avoid summary judgment only by providing properly supported evidence of disputed material facts that would require trial. LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993), cert. denied, 511 U.S. 1018, 114 S. Ct. 1398, 128 L. Ed. 2d 72 (1994).  Accordingly, "the nonmoving party 'may not rest upon mere allegation or denials of his pleading,'" but must set forth specific facts showing that there is a genuine issue for trial.  Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S. Ct. 2505, 2514, 91 L. Ed. 2d 202 (1986)).  The court must view the record in the light most favorable to the non-moving party and indulge all reasonable inferences in that party's favor.  See Vineberg, 548 F.3d at 56.  "If, after viewing the

record in the non-moving party's favor, the Court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law, summary judgment is appropriate." Walsh v. Town of Lakeville, 431 F. Supp. 2d 134, 143 (D. Mass. 2006).

In seeking to avoid summary judgment in the instant case, Neponset relies primarily upon Collins' Affidavit. "Summary judgment is generally appropriate against the nonmoving party where that party relies on 'conclusory allegations, improbable inferences, and unsupported speculation.'" Orient Overseas Container Line v. John T. Clark & Sons of Boston, Inc., 229 F. Supp. 2d 4, 8 (D. Mass. 2002) (quoting DeNovellis v. Shalala, 124 F. 3d 298, 306 (1st Cir. 1997)). "The same principle applies to expert affidavits." Id. "Where an expert presents 'nothing but conclusions – no facts, no hint of an inferential process, no discussion of hypotheses considered and rejected,' such testimony will be insufficient to defeat a motion for summary judgment." Hayes v. Douglas Dynamics, Inc., 8 F.3d 88, 92 (1st Cir. 1993) (quoting Mid-State Fertilizer v. Exchange Nat'l Bank, 887 F.2d 1333, 1339 (7th Cirr. 1989)). As described below, this principle is directly applicable to the expert testimony presented by the plaintiff in the instant case.

### B.   Proof of Neponset's Failure to Establish Actual Damages

NML argues that there can be no dispute that Collins' use of the Contingency Fund item in his expert report is erroneous, and that when his calculation is adjusted to eliminate the error, it shows that no Earnout Amount is due to Neponset. Therefore, even

if it is assumed that NML failed to use good faith efforts to manage the Property in a commercially reasonable manner, and that Collins is correct with respect every other element of his Earnout calculation, NML contends that Neponset has not proven that it suffered any measurable harm.  This court finds that NML has met its burden of establishing that there are no genuine issues of material fact with respect to this issue, and that Neponset has not proven that it suffered actual damages as a result of NML's conduct.

### Neponset Reduced Expenses by the Contingency Fund

The first issue is whether NML has presented evidence showing that Collins adopted NML's maintenance expense figure in his above-the-line calculation of operating expenses, and that NML's figure incorporated the $83,558 annualized net credit from the Contingency Fund expense item.  Despite Neponset's categorical denial (without further explanation), this court finds that the undisputed facts establish that Collins' maintenance and repair figure of $374,763 is based on NML's calculation of total maintenance expenses ($374,764), which is comprised of an annualized maintenance figure of $458,322 less a credit of $83,558 reflecting the annualized Contingency Fund.

First, Neponset argues that it never had Smith's 2009 Operating Statement Summary Report when Collins did his analysis, so that Collins could not have relied on the Report or on the calculations contained therein.  (PR ¶¶ 8, 10-12,14; Pl. Opp. Mem. at 3).  This argument is unpersuasive.  The record establishes that Collins had the NML

figures on which Smith based her Summary Report.[6]  The fact that Collins did not have

the Summary Report itself is not inconsistent with a finding that his above-the-line

maintenance figure included a reduction for the Contingency Fund.

Second of all, Collins expressly has confirmed that he relied on NML's expense

figures in order to perform his calculation of commercially reasonable operating expenses.

(See Appraisal Report at 15 ("Source: Compiled from NML Data")).  Moreover, a com-

parison of Collins' annualized expense figures with NML's figures indicates that while

Collins did not find all the expenses identified by NML to be appropriately considered, he

used NML's figures and did not calculate them anew.  For example, the annualized

administrative expense figure Collins accepted as an appropriate expense was derived by

taking NML's administrative expense figure of $410,178 and subtracting NML's manage-

ment fee figure of $191,329.[7]  (Compare Appraisal Report at 15 with Smith Aff., Ex. 3).

The annualized renting, utility, maintenance and turnover expenses used by Collins in his

above-the-line analysis match NML's figures for those expense items without alteration.[8]

_____

[6]  For example, on page 2 of his July 13, 2010 letter to Mr. Terence W. Conroy, Jr.
accompanying his Appraisal Report, Collins states that he "[a]nalyzed income and expense
information provided by Neponset Landing Corporation as obtained from NML or its representa-
tives."  He also states, on page 14 of his Appraisal Report, that the Operating Expense Analysis
was based, in part, "on study of NML's suggested expense statement[.]"

[7]  When NML's $410,178 administrative expense figure is reduced by $191,329 it results
in an annualized expense of $218,849, which is one dollar more than Collins' figure of $218,848.
Nevertheless, Collins describes his expense items as "NML expense[s]" and expressly notes, as
depicted in the chart above, that his administrative expense is less the management fee.

[8]  The maintenance expense figure shown in Collins' analysis also is one dollar less than
the $374,764 figure used by NML in its calculations.  Again, however, the description of these

(<u>Compare</u> Appraisal Report at 15 <u>with</u> Smith Aff., Ex. 3).  Therefore, NML has established that Collins obtained the $374,763 annualized maintenance expense figure from NML's expense statement rather than by making a separate calculation.  Because it is undisputed that NML's annualized maintenance expenses for the Earnout Period incorporated the $83,556 credit from the Contingency Fund, (<u>see</u> Smith Aff., Ex. 2 at 3 and Ex. 3), the record supports the conclusion that Collins effectively included that credit in his above-the-line expense calculations.  Therefore, Collins' decision to use the Contingency Fund to reduce operating expenses a second time when he included some of the Contingency Fund expense months in his below-the-line adjustment was in error.  (<u>See</u> Smith Aff. ¶ 8).  As NML argues in its memorandum, this procedure is comparable to "calculating a person's net worth by subtracting their liabilities from their assets and then [subtracting] the liabilities again from the total."  (Def. Mem. (Docket No. 47) at 13).  It simply makes no logical sense and constitutes a flaw in Collins' analysis.

## Effect of Correction

NML also has introduced evidence showing that no Earnout would be due if Collins' analysis were adjusted to rectify the error in his calculations.  In particular, NML has shown that if the Contingency Fund were excluded altogether both above and below the line, it would result in a $279,681 reduction to Collins' calculation of the NOI, and a decrease of over $4.3 million in his assessment of the Final Capitalized Value.  (Smith

expenses as "NML expense[s]" indicates that Collins based his annualized maintenance expense figure on NML's number.

Aff. ¶ 10).  Because this would bring Collins' Final Capitalized Value figure below the $75,584,764 Purchase Price, no Earnout Amount would be due to Neponset.  (See Appraisal Report at 16 (depicting Collins' calculation of Final Capitalized Value)).[9]

NML also has presented evidence showing that if the $196,125 Contingency Fund expense figure were eliminated in Collins' below-the-line calculations, but no other changes were made to his above-the-line analysis, the adjustment would result in a Final Capitalized Value of $74,844,865, an amount below the Purchase Price.  (Smith Aff. ¶ 11).  This, too, would result in an Earnout Amount of zero.  Therefore, NML has presented facts showing that Neponset has not proved actual damages.

### C.    Neponset's Failure to Establish a Genuine Issue of Fact

Neponset has failed to come forward with any evidence to establish a genuine issue of fact with respect to its claim for damages.  In particular, Neponset's expert has failed to provide any specific facts, as opposed to conclusory allegations, demonstrating the soundness of his analysis or otherwise disputing NML's claim of error.  Moreover, although Neponset has raised a number of legal arguments in an effort to avoid summary judgment, this court finds that those arguments fail to address the flaw in Collins' analysis.  There-

---

[9]  Collins argues that he would never have used NML's maintenance figure of $458,322 (which ignores the Contingency Fund reduction) because it would have yielded maintenance expenses of $1,637 per unit, a figure far in excess of the normal and customary maintenance costs of a property that was being managed in a commercially reasonable manner.  (Collins Aff. ¶ 4). This argument does not refute the fact that, whatever his intent, Collins reduced the maintenance expenses twice by deducting the Contingency Fund twice.

fore, this court finds that even when the record is viewed in the light most favorable to the plaintiff, it establishes that Neponset has not proved damages in this case.

**Neponset's Challenge to Smith's Opinions**

Neponset argues, as an initial matter, that NML's contentions regarding Collins' projection of maintenance expenses is based solely on Smith's speculation as to how Collins conducted his analysis.  (Pl. Opp. Mem. at 3).  Neponset points out that NML never asked Collins how he arrived at the maintenance expense figure of $374,763, and it highlights Collins' testimony in which he stated that Smith's opinions regarding the manner in which he derived that figure "are entirely inaccurate."  (Id. (quoting Collins Aff. ¶ 3)).  However, Neponset has pointed to no specific facts to show why Smith's opinions are inaccurate or to rebut the evidence set forth in Collins' own Appraisal Report indicating that he adopted the maintenance expense figure provided to him by NML.  In particular, Collins has provided no explanation as to how he arrived at that number.  (See Collins Aff. ¶¶ 3-8).  "[A] party may not avoid summary judgment solely on the basis of an expert's opinion that fails to provide specific facts from the record to support its conclusory allegations."  Evers v. Gen. Motors Corp., 770 F.2d 984, 986 (11th Cir. 1985), cited with approval in Hayes, 8 F.3d at 92.  Collins' conclusory statement that Smith's opinions are inaccurate is insufficient to create a genuine issue of fact.  See Palomar Med. Techs., Inc. v. Candela Corp., No. 06-11400-RWZ, 2011 WL 1576580, at *4 (D. Mass. Apr. 26, 2011) (finding that conclusory allegations, even from an expert, are insufficient

to defeat summary judgment, and striking expert opinion which contained conclusory statements and lacked an explanation as to how expert arrived at his opinion).

Neponset also attempts to discredit Smith's testimony by arguing that in Smith's opinion, Collins derived his maintenance expense figure from the 2009 Operating Statement Summary Report, but that Collins never saw the Report, and it played no role in his analysis.  (Pl. Opp. Mem. at 3).  As detailed above, this argument too is unpersuasive. Although Smith repeatedly references the 2009 Operating Statement Summary Report in support of her opinion that Collins erred in his analysis, it is clear from her testimony that she was using the 2009 Operating Statement Summary Report to illustrate how she performed NML's Earnout calculation, to show how she used the Contingency Fund item to arrive at her maintenance expense figure, and to illustrate why Collins' analysis was erroneous.  (See Smith Aff. ¶¶ 5-8).  She was not suggesting that Collins' analysis was based on the 2009 Operating Statement Summary Report.  Moreover, the fact that Collins may not have seen the 2009 Operating Statement Summary Report before conducting his analysis or completing his expert report is immaterial.  As described above, Collins' own Appraisal Report lists the maintenance expense as an "NML expense" and adopts the same figure that Smith had used in her own calculations.  (See Appraisal Report at 15; Smith Aff., Ex. 3).  Even if Collins never saw a copy of the 2009 Operating Statement Summary Report as he asserts, the record establishes that he had, and used, NML's expense figures at the time he performed his Earnout calculations.

Next, Neponset challenges Smith's suggestion that Collins "should have made no reduction to the 'Maintenance Sub-Total'" of $458,322 by using the net credit from the Contingency Fund if he had intended to eliminate the effect of the Contingency Fund item on his Earnout calculation.  (Pl. Opp. Mem. at 4).  Thus, Neponset contends that its expert would not have used NML's $458,322 figure because it would have resulted in an unreasonably high maintenance expense of $1,637 per unit, and would have been far in excess of customary maintenance costs if the Property had been managed in a commercially reasonable manner.  (Id. (citing Collins Aff. ¶ 4)).  In order to support its position on this point, Neponset notes that NML's own expert, Allan D. Foster ("Foster"), used a maintenance figure well below the $458,322 figure suggested by Smith, and it describes how using Foster's maintenance expense figure in Collins' analysis still would have resulted in an Earnout Amount of $352,751.  (Collins Aff. ¶¶ 5-7; Pl. Opp. Mem. at 4-6).  Therefore, Neponset asserts that Smith's opinion conflicts with the opinion of NML's own expert.  (Pl. Opp. Mem. at 7).  In addition, Neponset notes that the operating expense figure which Collins arrived at amounted to $3,368 per unit, and was higher than the $3,286 per unit figure that the parties had agreed was reasonable under the terms of their Purchase Agreement, and, therefore, more favorable to NML.  (Pl. Opp. Mem. at 7 (citing Collins Aff. ¶ 8)).

This court finds that Neponset's arguments, and its reliance on Foster's opinion, appears to be little more than an effort to confuse the issue raised by NML's motion for summary judgment.  Although Neponset uses Foster's opinion to show what would have

happened if Collins had used Foster's maintenance expense number, Collins describes this calculation as a "hypothetical exercise."  (Collins Aff. ¶ 6).  He emphasizes that the $352,751 Earnout Amount is merely an "illustration" of what the result would have been if he used Foster's number, and he does not suggest that he is proposing to alter his own opinion.  (See id. ¶ 7).  Nor does he suggest that he is willing to adopt Foster's calculation.  Similarly, he did not adopt the Purchase Agreement operating expense figure.  Rather, Collins maintains that in his opinion, based on his calculations, Neponset is entitled to an Earnout Amount of $1,123,920.  (Id.).  As described above, that figure reflects the error in Collins' operating expense analysis.

In short, the issue is not what Collins should have or might have done, but what he did do to reach his opinion about the Earnout Amount.  The evidence shows that Collins adopted NML's maintenance expense figure, and that in doing so, he incorporated the credit from the Contingency Fund into his above-the-line expense calculation.  Therefore, Collins' second reduction in operating expenses based on the Contingency Fund expense months reflects an error in his analysis.

Finally, Neponset seeks to avoid summary judgment on the grounds that even if Collins made a mistake in his work, summary judgment would be inappropriate because Collins based his opinion upon a sound methodology, and any error in his analysis "goes merely to the weight a fact finder would give to Mr. Collins' opinion and not its admissibility."  (Pl. Opp. Mem. at 13).  In other words, Neponset asserts that "[a]bsent any flaws in his underlying *methodology*, the appropriate way for NML to attack Mr. Collins' con-

clusions, or any purported error in his work, is through cross-examination, not through its current motion." (Id. at 14). However, NML is not challenging the admissibility of Collins' expert opinions. Compare Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 585, 113 S. Ct. 2786, 2792, 125 L. Ed. 2d 469 (1993) (cited by plaintiff) (addressing "the standard for admitting expert scientific testimony in a federal trial"); Seahorse Marine Supplies, Inc. v. P.R. Sun Oil Co., 295 F.3d 68, 80-81 (1st Cir. 2002) (cited by plaintiff) (affirming district court's decision to admit expert testimony over defendant's argument that testimony was inherently unreliable and therefore inadmissible under Daubert); Haemonetics Corp. v. Baxter Healthcare Corp., 593 F. Supp. 2d 303, 305-06 (D. Mass. 2009) (cited by plaintiff) (denying motion to exclude testimony of plaintiff's expert based on challenge to expert's methodology and failure to comply with standard set forth in Fed. R. Evid. 403). Rather, NML contends that the plaintiff has failed to prove damages when the flaw in Collins' analysis is recognized. This court agrees.

## Counsel's May 6, 2011 Letter

As described above, on May 6, 2011, counsel for NML sent Neponset's counsel a letter in which he described how the defendant had used the net credit from the Contingency Fund item to increase NOI for the Earnout Period, and to which he attached a copy of the 2009 Operating Statement Summary Report. (Def. Ex. 2). Although the plaintiff asserts that the letter "is not particularly germane" to the pending motion, it nevertheless argues that NML misstated the purpose of the letter in its summary judgment papers by representing that its purpose was to explain NML's calculation of the Earnout

"[i]n light of Mr. Collins' miscalculation" when, in fact, the purpose of the letter was to address an unrelated discovery matter.[10]  (Pl. Opp. Mem. at 15-16).

This court agrees that the letter does nothing to influence the outcome of the defendant's motion.  If anything, it shows that NML gave Neponset an opportunity to address Collins' treatment of the Contingency Fund expense item before he produced his expert witness report.  (Def. Ex. 2).  Neponset has failed to provide any explanation as to how Collin's treated that item, even at this stage of the litigation.  The purpose behind the letter, and NML's description of that purpose, is irrelevant to the matters at issue on summary judgment.  Accordingly, Neponset's argument fails to create any disputed issues of fact or to demonstrate why NML is not entitled to judgment as a matter of law with respect to the issue of damages.

### D.     NML's Entitlement to Summary Judgment

Given Neponset's failure to prove that it suffered any damages, the question remains as to whether NML is entitled to summary judgment on each of the plaintiff's claims.  The defendant argues that damages are an essential element of each of Neponset's claims, and that therefore, all of those claims are defeated by its inability to prove damages.  (Def. Mem. at 17-18).  On this point, NML is mistaken.  It is true that damages

---

[10]  Neponset also suggests that NML misrepresented the contents of the letter in its opposition to the Plaintiff's Motion to Strike Portions of the Affidavit of Robin G. Smith.  (Pl. Opp. Mem. at 16).  Because this argument is not relevant to the motion for summary judgment, and does not impact this court's analysis with respect to the Motion to Strike, it is unnecessary to address the argument further.

"are an essential element" of a claim under Mass. Gen. Laws ch. 93A.  Weeks v. Harbor

Nat'l Bank, 388 Mass. 141, 144 n.2, 445 N.E.2d 605, 607 n.2 (1983).  However, "[u]nder

Massachusetts law, a person who is injured by a breach of contract has a right to judgment

even if the breach caused no harm."  Flynn v. AK Peters, Ltd., 377 F.3d 13, 23 (1st Cir.

2004).  See also Johnson v. Cohan, No. CA 9607352, 2000 WL 1273568, at *6 (Mass.

Super. Ct. June 5, 2000) (finding that lack of compensable damages did not warrant

summary judgment against claim for breach of implied covenant of good faith and fair

dealing).  "In such a case, the plaintiff is entitled to symbolic nominal damages[.]"  St.

Charles v. Kender, 38 Mass. App. Ct. 155, 161, 646 N.E.2d 411, 414 (1995).  See also

Flynn, 377 F.3d at 23 (finding that trial "court should have allowed [plaintiff's] breach of

contract claim to go to the jury with an instruction on nominal damages", but that plaintiff

"forfeited her right to appeal the court's erroneous conclusion that she was required to

prove actual damages to establish a breach of contract claim").

NML nevertheless argues that summary judgment is appropriate because no useful

purpose would be served by trying the case simply for an award of nominal damages, and

the failure to enter summary judgment would result in an obvious waste of time and

resources.  (Def. Reply Mem. at 15-16).  However, because Neponset has expressed a

desire to pursue its contract claims in the instant case, even if it may recover no more than

nominal damages, summary judgment would not be appropriate with respect to the those

claims.  See St. Charles, 38 Mass. App. Ct. at 161, 646 N.E.2d at 414 (giving the plaintiff

an opportunity to adjudicate "the abstract question whether [the defendant] committed a

breach of her contract . . . entitling her to nominal damages" before contract claim was

finally dismissed).  See also Schwartz v. Travelers Indemnity Co., 50 Mass. App. Ct. 672,

682 n.13, 740 N.E.2d 1039, 1047 n.13 (2001) (noting that court in St. Charles had allowed

plaintiff the opportunity to adjudicate her claim, but finding no useful purpose in allowing

plaintiff to do so where plaintiff had not urged the point).  Therefore, the motion for

summary judgment is allowed with respect to the plaintiff's claim under Chapter 93A, but

denied with respect to its contract claims.

## IV.  CONCLUSION

For all the reasons detailed above, the "Defendant's Motion for Summary Judgment

on Plaintiff's Complaint" (Docket No. 46) is ALLOWED IN PART and DENIED IN

PART.  Specifically, NML's motion is ALLOWED with respect to the Chapter 93A claim

set forth in Count III of Neponset's complaint, but DENIED with respect to the contract

claims set forth in Counts I and II.

                                         / s / Judith Gail Dein
                                        Judith Gail Dein
                                        U.S. Magistrate Judge